Frank Sturges *et al.*

*v.*

Samuel L Keith.

1. BANKER—*liability for special deposit.* If a sole party, as a banker, receive stock or coin upon special deposit, and it be embezzled by his own clerk or cashier, then, although that would be a wrongful conversion of the property, still it would not be the act of the banker, nor would he be liable for such conversion, unless he participated in it, or was guilty of gross negligence, and the same rule would apply in case of a firm of bankers.

2. TROVER—*demand of an agent.* If stocks be delivered to the agent of a banking firm, as a special deposit in their bank, and subsequently a portion of the members of the firm withdraw, the former agent of the firm will thereupon cease to be the agent of the retiring members, so that upon an action of trover being brought, after the dissolution, against all the original partners, for an alleged conversion of the stocks, a demand upon the agent will not afford *prima facie* evidence of conversion as against those who had previously withdrawn.

3. TROVER—*whether it will lie.* A conversion is a positive, tortious act; mere *non feasance* or neglect of some legal duty will not suffice to support trover, although it may constitute sufficient ground to maintain an action on the case.

4. So if a party be authorized by power of attorney to sell certain stocks, and the agent violate the instructions, or in any manner abuse his authority

to the injury of his principal, his wrongful acts in that regard will not constitute a conversion so as to support an action of trover, but the remedy would be an action on the case for such abuse.

5. Same—*evidence in rebuttal as to conversion.*   In an action of trover for an alleged conversion of property, proof that the defendant sold the property under a power of attorney would rebut the *prima facie* case made for the plaintiff by a demand and refusal.

6. Parol evidence—*to vary the terms of a power of attorney.*   Where an agency is created and conferred by a written instrument, the nature and extent of the authority must be ascertained from the instrument itself, and parol evidence is not admissible to vary or contradict it.

7. Measure of damages—*in trover, for the conversion of railway stocks.* The rule in this State is, that the proper measure of damages in an action of trover is the current market value of the property at the time of the conversion, with interest from that time until the trial, and no exception is recognized where the property converted happens to be stocks.

8. Same—*as to the time of estimating value.*   Where the demand and refusal either constitute the conversion, or afford presumptive evidence of it, it is no infringement of this rule to regard *that* as the time for estimating the value.

9. Same—*of evidence admissible to fix value.*   In an action of trover to recover for the alleged conversion of certain railroad stock, it was held to be competent for the plaintiff to give evidence tending to show that the railroad company was about to, and did, increase the stock, and that owners of stock were, by its regulations, to have a certain *pro rata* of the new stock at reduced rates,—not to enable the plaintiff to recover the value of the new stock as special damages, but as being a circumstance which would legitimately bear upon the question of the value of the stock converted.

Appeal from the Circuit Court of Cook county ; the Hon. Erastus S. Williams, Judge, presiding.

Messrs. Walker & Dexter, and Messrs. Higgins, Swett & Quigg, for the appellants.

Messrs. Beckwith, Ayer & Kales, for the appellee.

Mr. Justice McAllister delivered the opinion of the Court:

This was an action of trover, brought in the circuit court of Cook county, by appellee against appellants, to recover for

the alleged wrongful conversion of 250 shares of the common stock of the Chicago & Alton Railroad Company.

It appears from the evidence, that, in May, 1864, the appellants, Frank Sturges, Albert Sturges, George Sturges, Buckingham Sturges and Shelton Sturges, were engaged as co-partners in the business of banking, under the firm name of Solomon Sturges' Sons; that the appellant William Sturges, was not a member of the firm, but a managing agent thereof; that appellee, being a customer of this banking house, and himself and partner being indebted to the same in the sum of about $13,000, upon a gold transaction, in the month of May aforesaid, brought to the bank certificates for 250 shares of the above mentioned stock, and by an arrangement conducted exclusively between him and William Sturges, the stock was left in the bank, but whether as security for the indebtedness of appellee and partner to this banking house, or merely for safe keeping, is a fact as to which the evidence of the parties is conflicting. It, however, does appear, that at the time of leaving the stock and closing the arrangement in reference to it, appellee executed a power of attorney to the Sturges last named, authorizing him to sell and transfer the stock, and there is nothing in this record which discloses that appellee ever attempted, by any express act of revocation, or by giving instructions inconsistent with such power of attorney, to revoke the same, until about the 22d day of March, 1866, when he caused a demand in writing, for the return of the stock to him, to be served upon said William, and in July next thereafter commenced this suit against all the parties above named, for the wrongful conversion of the stock.

It further appears, by the evidence in the case, that in September, 1864, Albert and Buckingham Sturges bought out the other members of the firm, the latter then retiring therefrom, and the former continuing the business. And also that in the latter part of January, 1865, William Sturges sold the stock in question; but it does not appear that any of the other defendants participated in the act, either by previous command

or subsequent ratification, except the mere fact that the transaction was entered in the books of the firm, then composed of Albert and Buckingham Sturges only.

The court below instructed the jury, on behalf of appellee, that, " if the plaintiff was the owner of 250 shares of the stock of the Chicago & Alton Railway Co., and deposited the same with the agent of the defendants in the usual course of business, either as a special deposit for safe keeping, or as collateral security for an indebtedness, and such deposit was known to the defendants, the law implied a duty on their part to safely keep the stock; and if the jury further believe, from the evidence, that said stock has been wrongfully converted, then the defendants are liable in this action, and no one of the defendants can shield himself from liability by reason of his withdrawal from the firm after said stock was deposited with their agent. "

This instruction was wrong, and well calculated to mislead the jury. It is not only obnoxious to criticism, in that it did not require the jury to find that the stock was deposited with the agent of the defendants, as such, or on their behalf, but it is based upon a misconception of the law, both of bailment and partnership, as well as of the action of trover. The fair import of the instruction is, and the jury must have so understood it, that if the stock was left with the agent of the defendants as a special deposit, and they knew it, then they became so far insurers of its safety (though without compensation) that if it was afterwards wrongfully converted, no matter by whom or under what circumstances, still all of the members of the firm would be liable in trover, notwithstanding the dissolution of the firm before such conversion.

The difficulty with the proposition is, that if a sole party should, as a banker, receive stock or coin upon special deposit, and it should be embezzled by his own clerk or cashier, then, although that would be a wrongful conversion of the property, still it would not be the act of the banker, nor would he be liable for such conversion unless he participated in it, or was

guilty of gross negligence. Story on Bailments, sec. 88. If a sole party would not be liable under the circumstances supposed by the instruction, then, of course, several would not.

After the most diligent and careful examination of this record, we are satisfied that no cause of action in trover was shown, as to part of the defendants, at least.

The only demand that was made, was upon William Sturges, in March, 1866. He was not a member of the firm, but an agent. The stock was left with him in May, 1864, and in September of the same year the firm was dissolved, Frank, George and Shelton retiring from it, and Albert and Buckingham Sturges continuing the business. From the time of the dissolution, William ceased to be the agent of the retired members of the firm.

The demand upon him, therefore, would not afford *prima facie* evidence of conversion, as against those who had withdrawn.

It has been held that, where bailees of goods *are partners*, a demand upon and refusal by one, would be regarded as *prima facie* evidence of conversion by all. *Lloyd* v. *Bellis*, 37 Eng. L. and Eq. 545 ; *Holbrook et al.* v. *Wight*, 24 Wend. 168.

This rule springs from the partnership relation, and not from that of mere joint bailees; because, although there may be a joint contract of bailment, yet, in the absence of the partnership relation, a demand upon and refusal by one bailee will not afford *prima facie* evidence of conversion against the others. *Mitchell* v. *Williams*, 4 Hill, R. 13 ; *White* v. *Demary*, 2 New Hamp. R. 546 ; 2 Greenl. Ev. sec. 644.

While the partnership exists, it speaks and acts only by its several members, and, of course, when that existence ceases by the dissolution of the firm, the act of the individual member ceases to have that effect. 1 Greenl. Ev. sec. 112 ; 3 Kent's Com. 63.

It follows, as a necessary consequence, that a refusal upon demand, by one of the members of a firm, after its dissolution,

would not have the effect to bind the others. *Pattee* v. *Gilmore et al.* 18 New Hamp. R. 460.

So that if the demand had been made upon Albert and Buckingham Sturges in March, 1866, their refusal could have had no effect upon the others in charging them with a conversion, and much less would that of their agent.

If William Sturges had a power of attorney authorizing him to sell the stock, proof of the sale under it would rebut the *prima facie* case made by demand and refusal. It is true that it was not competent to prove the authority by parol. *McKinney* v. *Leacock*, 1 Serg. & R. 27 ; *Hovey* v. *Deane*, 13 Maine, 31 ; Dunlap's Paley on Ag. 310. The evidence was introduced on both sides without objection. Appellee was asked this question : " You did, then, execute a power of attorney, by authority of which he could sell the stock, could'nt he ? " To which he answered: " Yes, sir, he could. I gave him the power. " And if, according to appellee's own theory, the stock was not left as a pledge, it is difficult to see how trover could be maintained. If the agent did not obey instructions, he might be liable upon a special count in case; but a conversion is a positive, tortious act. Mere *non feasance,* or neglect of some legal duty, will not suffice to support trover, although it may constitute sufficient ground to maintain an action on the case.

It does not appear that the power of attorney was produced on the trial. If it had been, parol evidence would not have been admissible to vary or contradict it. When the agency is created and conferred by a written instrument, the nature and extent of the authority must be ascertained from the instrument itself, and parol evidence is not admissible to vary or contradict it. Story on Ag. sec. 76.

Both parties treated it as if produced and subsisting at the time of the sale. If so, it would sustain a plea of leave and license, and the sale under it confer a good title upon the purchaser ; which could not be the case, if William Sturges had

no authority to sell, and the sale was a tortious act.   *Sarjeant* v. *Blunt,* 16 Johns. R. 74.

It was a license given by the party, not by the law.   Where a license is given by the law, and the person acting under color of such authority, abuse it, the authority is gone, and he is a trespasser *ab initio.*   Not so, as to one acting under authority given by a party.   In the latter case, the abuse of it does not avoid the authority, but affords ground for an action on the case for such abuse.   The subsequent conduct of the party was relied upon as establishing want of authority.   The sale in violation of instructions, the fraudulent concealment of the fact, and failure to account, if such were the fact, would constitute a breach of trust, but would not avoid the power of attorney, if not revoked, and this record fails to show any attempt to revoke it until the demand made upon William Sturges, in March, 1866. . Neither this demand and refusal, nor the misconduct of William Sturges subsequent to the sale, though with the privity and consent of his principals, Albert and Buckingham Sturges, could afford the slightest evidence of a wrongful conversion, against the retired partners.   *Weymouth* v. *Boyer,* 1 Vesey, 424; *Palmer* v. *Jermaine,* 2 Mees. & Welb. 282; *Steirreld* v. *Holden,* 4 Barn. & Cres. 4; *Kelscy* v. *Griswold,* 6 Barb. 442; *Baltimore Ins. Co.* v. *Dalrymple,* 25 Md. R. 272.

The only other question discussed in this case, is the measure of damages, and the propriety of the instruction to the jury by the court below, on that subject, the substance of which was, that if the jury found the defendants guilty, then, inasmuch as the plaintiff had elected to take it, the measure of damages was the market value of the stock at the time of the trial, together with the cash dividends declared since February, 1865, and the jury were at liberty to allow interest on such dividends at the rate of six per cent per annum from the time of their respective payments by the railroad company.

It appears in the case that the stock was sold in January, 1865, for $93 per share, which is claimed to have been its

then market value. The demand was made for it by appellee in March, 1866. In July next thereafter this suit was commenced; but it was not tried until the October term, 1868, at which time the stock had advanced to $151.50 per share. Under the instructions given, the jury found all the appellants guilty, and assessed appellee's damages at $47,058.06, and must therefore have determined the value of the stock at the market price at the time of the trial.

Neither the last mentioned instruction nor any other, contained any hypothesis as to whether the suit had been brought within a reasonable time, or prosecuted with diligence, or whether from the evidence the conduct of appellants was fraudulent, or whether from the evidence there was good reason for believing that appellee procured the stock for a permanent investment, or would have kept it so as to have realized the price ruling at the time of the trial.

The rule of damages adopted by the circuit court must, therefore, have excluded all consideration of punitive or exemplary damages, and have been based upon the sole idea of indemnity to appellee, and virtually declares that the bailor may bring his suit at any time within the period of the statute of limitations, and then, upon the arbitrary presumption of law, that he originally obtained the stock for a permanent investment, and would have kept it until the time of the trial, he is allowed to elect to take the price at that time as the measure of damages, thus making the measure of damages depend upon presumptions that may be against the fact—the circumstance of venue, and the strategy of movement as to the time of trial, instead of any fixed or definite rule.

In *Suydam* v. *Jenkins*, 3 Sandf. 626, the court, in an opinion delivered by Duer, J. and remarkable for its ability, research and thoroughness, says: " In trover, the general rule, both in England and the United States, undoubtedly is, that the current or market value of property at the time of conversion, with interest from that time until the trial, is the true measure of damages;" citing, in support of the proposition, a large

number of cases, to which may be added : *Moody* v. *Whitney,* 38 Maine, 174; *Walker* v. *Borland,* 21 Mo. 289–294; *Baltimore M. Ins. Co.* v. *Dalrymple,* 25 Md. 272; *Park* v. *Boston,* 15 Pick. 198; Greenl. Ev. vol. 2, sec. 276; id. sec. 649; Sedg. on Dam. (marg. p.) 481; *Keaggy* v. *Hite,* 12 Ill. R. 99; *Otter* v. *Williams,* 21 id. 118; *Yates* v. *Mullin,* 24 Ind. R. 277.

There can be no doubt but that the rule adopted by the learned circuit judge was based upon a supposed exception to the general rule of damages, on account of the subject matter of the action being stocks. Such an exception to the general rule of damages in actions *ex contractu* was made in England as early as 1802, in the case of *Shepherd, executor, etc.* v. *Johnson,* 2 East, 211. This case was a writ of inquiry to assess damages on a bond given by the defendant, conditioned that his co-obligor should replace a certain quantity of stock which the testator had lent him, and which was to have been replaced on the 1st of August, 1799. By the general rule of damages, the recovery would have been for the market value at or about the day it should have been delivered. But because it was stock, an exception was made to this general rule; and the stock having advanced, the court held the market value at the time of the trial, was the proper rule of damages. Nothing short of that, it was thought, would afford complete indemnity to the plaintiff for the breach of the engagement, and thus this exception to the general rule originated from a ground merely conjectural and speculative, viz : that the plaintiff would have kept his stock so as to realize the price at the trial. From that time to 1824, the cases of *McArthur* v. *Seaforth,* 2 Taunt. 258, *Downs* v. *Back,* 1 Stark. R. 318, and *Harrison* v. *Harrison,* 1 Car. & P. 411, were decided, recognizing the same exception. In *Gainsford* v. *Carroll,* it was sought to apply the rule of the foregoing cases in an action of assumpsit for not delivering goods upon a particular day, but which had not been paid for ; but the court said, " Those cases do not apply to the present. In the case of a loan of stock, the borrower

holds in his hands the money of the lender, and thereby prevents him from using it altogether. "

But in *Greening* v. *Wilkinson*, 1 Car. & P. 623, (tried in 1825,) which was trover for East India Co's warrants for cotton, evidence was given that the cotton was worth six pence per pound on the day of the refusal to deliver it up, but at the time of the trial would be worth ten pence half penny.

For the defendant it was contended that, on the authority of the case of *Mercer* v. *Jones*, 3 Camp. 477, the damages should be the value at the time of the conversion; but for the plaintiff, that it must be the price at the time of the verdict, in the same way as damages for the non-performance of an agreement to replace stock.

ABBOTT, C. J., said the case of *Mercer* v. *Jones* was hardly law, and that the amount of damages is for the jury, who may give the value at the time of the conversion, or at any subsequent time, in their discretion, because the plaintiff might have had a good opportunity of selling the goods if they had not been detained.

*Mercer* v. *Jones, supra,* was trover for a bill of exchange, and Lord ELLENBOROUGH said: " In trover, the rule is that, the plaintiff is entitled to damages equal to the value of the article converted, at the time of the conversion," and directed a verdict for the amount of the bill and the interest up to the time of the conversion. Although ABBOTT, C. J., declared that this case was hardly law, yet, in *Keaggy* v. *Hite, supra,* which was trover for a note and mortgage, this court, in announcing the rule of damages, said: " The plaintiff, if entitled to recover at all, is entitled to a verdict for the full amount due upon the note and mortgage at the time of the conversion," and this rule, which was precisely the same as that laid down by Lord ELLENBOROUGH in *Mercer* v. *Jones, supra,* was again approved by this court in *Otter* v. *Williams, supra.*

It is true, that in the former case, Mr. Justice Trumbull, who delivered the opinion of the court, cited the case of *Cortelyou* v. *Lansing*, 2 Caines' Cases in Error, in support of the

rule.   It is difficult to understand why that case was cited for
that purpose.   That was an action of assumpsit, to recover the
value of a depreciation note, which had been left with the
defendant as a pledge for the security of a debt, but which had
been wrongfully sold by the pledgee more than ten years
before the demand and refusal.   The court held that the
demand and refusal did not show a cause of action, because
the plaintiff did not show that, at the time of the demand,
he was ready and willing to tender the amount of the
debt; and citing the case of *Shepherd* v. *Johnson,* 2 East,
approvingly, further held that, although the demand and
refusal did not constitute or afford evidence of the cause of
action, but that the sale of the note ten years before, did, yet
the plaintiff was entitled to recover the value of the note at
the time he chose to demand it.   Though this case was decided
twenty years before that of *Greening* v. *Wilkinson,* 1 Car. & P.
*supra,* the rule of damages is the same as in the latter, and the
latter repudiated that of *Mercer* v. *Jones,* which is the same this
court adopted in *Keaggy* v. *Hite, supra.*

It is very manifest that this court, in the citation of *Cortel-*
*you* v. *Lansing,* did not intend to adopt the rule of damages
therein recognized.*   Because the case in which it was cited
was decided at the Mount Vernon term of December, 1850,
and at the Springfield term in the same month, the case of
*Smith et al.* v. *Dunlap,* 12 Ill. 184, was decided; and in the

---

* NOTE BY THE REPORTER :

On the argument of the case of *Barrow* v. *Paxton,* 5 Johns. R. 260, the
counsel for the defendant in error cited the case of *Cortelyou* v. *Lansing,*
when he was interrupted by Mr. CHIEF JUSTICE KENT, who remarked:
" That case was never decided by this court.   It was argued once, and I had
prepared the written opinion, which appears in the report of Mr. *Caines;*
but the court directed a second argument, which, for some reason or other,
was never brought on, so that no decision took place on the points raised in
the cause.   How my opinion got into print, I do not know.   It was proba-
bly lent to some of the bar, and a copy taken, which the reporter has
erroneously published as the opinion of this court. "

well considered opinion of the court, delivered by CHIEF JUS-
TICE TREAT, the doctrine of *Shepherd, Executor,* v. *Johnson,* 2
East, of *McArthur* v. *Seaforth,* 2 Taunt., *Downs* v. *Back,* 1
Stark., and *Harrison* v. *Harrison,* 1 Car. & P. *supra,* recogniz-
ing this supposed exception to the general rule of damages,
when the subject matter of the action was stock, or the deliv-
ery of goods, the price of which had been pre-paid, is expressly
repudiated, and which doctrine, we believe, still remains under
the repudiation of a very strong, if not prevailing current of
American authorities. *Pinkerton* v. *Manchester & Lawrence
R. R.,* 42 New Hamp. R. 424, and cases there cited; *Sleuter
et al.* v. *Wallbaum,* 45 Ill. 43.

A majority of the court are unwilling to give our adherence
to this doctrine of exception to the general rule of damages
because the subject matter of the action happens to be stock;
because, if there were a just foundation for the distinction, in
the days of Mr. Justice Grose and when *Shepherd* v. *Johnson*
was decided, the changes of time and commerce have long
since worn it away. It is a fact, and one to which we can not
shut our eyes, that within the last quarter of a century almost
numberless private corporations have been brought into exist-
ence, whose stocks, real or fictitious, have inundated the
country, and supplied both the means and the stimulus for the
most active, reckless and corrupting speculations and practices
of the age. These are encouraged by the fact that now and
then, though the value of the franchise itself is the only capi-
tal, though it may be based upon lands, oil wells, mines, patent
rights or railroad schemes, yet, by the development of the
country, or some fortuitous circumstance, persons occasionally
realize great fortunes in these operations. Stocks, that cost
the owner little or nothing, now and then advance to par, and
above. Suppose the owner of such stocks should pledge them
when not worth ten cents on the dollar, and the pledgee
convert them. They cost the owner little or nothing. Cir-
cumstances arise, however, which enhance their value. By
delaying his suit, or the trial of it, until those circumstances

have had their full effect, the plaintiff, by invoking the aid of the presumptions: 1st. That he had parted with his money for the stock ;   2d. That he obtained the stock as a permanent investment; and, 3d, that it is to be presumed that he would have kept it until the time of the trial, can elect to take the market value at the time of trial, when each of these presumptions is as baseless as the fabric of a dream.   Such a rule, instead of being general, fixed and certain, is merely speculative, conjectural, and dependent upon accidental circumstances.

In *Smith et al.* v. *Dunlap, supra,* this court said that, " legal rules ought to be general in their application, so far as to embrace all cases depending on the same principles. "   Believing that to be a sound maxim, a majority of the court adhere to the general, well established rule in this State, viz: that the proper measure of damages in an action of trover is the current market value of the property at the time of the conversion, with interest from that time until the trial, and recognize no exception where the property converted happens to be stocks.

Where the demand and refusal either constitute the conversion or afford presumptive evidence of it, it is no infringement of this rule to regard *that* as the time for estimating the value ; and when the article converted is one which has no real market value, but its value is enhanced to the owner by personal or family considerations, then, from the necessity of the case, the rule of damages would be measurably within the discretion of the jury.

We think the evidence offered by the plaintiff, and excluded by the court, tending to show that the railroad company was about to, and did, increase the stock, and that owners of stock were, by its regulations, to have a certain *pro rata* of the new stock at reduced rates, was admissible,—not to enable the plaintiff to recover the value of the new stock, as special damages, but as being a circumstance which would legitimately bear upon the question of the value of the stock converted. As in trover for a ship, the plaintiff sought to prove, as special damages, the freight she would have earned on the next

voyage, but it was held by the court that such circumstance must be included in the value of the ship itself. Mayne on Dam. 213.

If the plaintiff had conceived that there was fraudulent misconduct on the part of the defendants, which called for exemplary damages, or if he could lay the foundation for special damages, the way was open to him to join special counts in case, when such misconduct would have been directly in issue. But we can not, from any considerations of supposed hardship of the case, extend the action of trover beyond its legitimate scope, " for trover, though nominally an action of tort, is usually brought to establish a mere right of property, and does not, like trespass, admit of evidence of aggravation." Sedg. on Dam. sec. 467.

For the errors indicated, the judgment of the court below must be reversed and the cause remanded.

*Judgment reversed.*