Race v. Chandler.

---

## RICHARD T. RACE
### v.
## ALBERT F. CHANDLER.

1. TROVER.—A conversion is a positive tortious act. Mere *non-feasance*, or neglect of some legal duty, will not suffice to support trover, although it may constitute a sufficient ground to maintain an action on the case.

2. CONVERSION.—Where certain notes were delivered by plaintiff to defendant for him to collect or negotiate for plaintiff, and there was no restriction as to the mode in which it should be done. *Held*, that defendant must be deemed to have had authority, by implication, to make use of such instrumentalities and to adopt such mode as in the ordinary course of business were usually employed for such purpose, and the mere fact that the

Race v. Chandler.

notes were left with defendant's brother, in Aurora, can not be held to constitute a conversion, especially in view of the fact that the notes were secured by deeds of trust, and the evidence tends to show the brother was the trustee.

3. DEMAND AND REFUSAL.—A demand and refusal do not of themselves constitute a conversion, but are only presumptive evidence of a conversion, capable of being rebutted by proof of any facts which constitute a legal justification or excuse for non-delivery.

4. WHAT THE REFUSAL MUST BE—WHEN INFERRED.—The refusal must be absolute, amounting to a denial of the plaintiff's title to the possession, and not a mere excuse or apology for not delivering the goods; but it need not be expressed—it may be inferred from non-compliance with a proper demand. Where defendant, upon demand, agreed to return plaintiff's notes the next day, but was delayed by the serious illness of his father for three days, and then, not finding them at home, was obliged to go to Aurora to get them from his brother. *Held*, that any inference of a refusal to be derived from defendant's delay in compliance with the demand, is fully rebutted by the circumstances of the case.

5. BREACH OF CONTRACT—TROVER.—That which begins in contract, a non-performance of what the party so undertakes to do, or a bare non-delivery of what he undertakes to deliver, is not to be considered as of itself amounting to a tortious conversion.

ERROR to the Superior Court of Cook county; the Hon. ELLIOTT ANTHONY, Judge, presiding. Opinion filed November 11, 1884.

This was an action of trover, brought by Albert F. Chandler against Richard T. Race, to recover damages for the conversion of three promissory notes, one for $1,410, dated May 19, 1876, and the other two for $200 each, dated August 2, 1876, all bearing interest at the rate of eight per cent. per annum. At the trial, without a jury, the court found the defendant guilty, and assessed the plaintiff's damages at $1,810, the face of the notes, without interest.

These notes originally belonged to the defendant and were drawn payable to his order, but were assigned and transferred by him to the plaintiff, together with certain deeds of trust securing the same, shortly after their execution, in payment for a bill of merchandise. Afterward, on the 16th day of August, 1877, the plaintiff delivered them back to the defendant and took from him a receipt, acknowledging that he

had received them from the plaintiff " for collection, or trans-
fer for his benefit." Said notes were never collected or
transferred by the defendant but were in his possession at the
time of the commencement of the suit, and the principal
question in the case was whether the evidence established a
conversion.

The only witnesses who testified were the plaintiff, the de-
fendant and the plaintiff's attorney. The plaintiff's testi-
mony on this point was as follows:

" I met the defendant in Coldwater and called on him for
the notes; I think it was some time in 1879; he was there
looking at some of his property and I told him I wanted to
get this matter in line. He told me he thought he could
make some disposition of them, and I told him I wished he
would, because I would like to see it closed up, and he said he
would do it and let me know. He didn't write to me and I
heard nothing from him. The next time I met him in Chi-
cago and he told me not to go to any expense, that he would
get it foreclosed and give me a title, and I told him to do so
if he would, and I would pay any expense he was put to. I
met him next in October, 1882, in a building on Clark street,
and spoke to him about it and told him that I wanted to get
this in line. I says, ' I have employed an attorney—Mr.
Sprague.' ' Well,' says he, ' I will bring those papers to Mr.
Sprague.' I says, ' I wish you would, I have been here a
long time now, trying to get this matter in line and I would
like to have it drawn up to a focus and find out whether I
have got anything there or not,' and he said he would do so
at once. The next time I said anything to him about it was
February 26, 1883. I was here four days before I found him.
' Why, yes,' he says, ' I will bring those papers down.' I
says, ' Now go right over to my attorney with me and we will
fix it up with him, as I want to go away and I can't foreclose
this trust deed without those notes,' and he agreed to deliver
the trust deed and notes the next morning at ten o'clock. He
said he thought it was in his brother's name but he could not
tell then. In the presence of my attorney Mr. Race said cer-
tainly, that the notes should be delivered there, and I might

Race v. Chandler.

just as well have a title to that property as not, and he would attend to it the next morning at ten o'clock. I says, 'Mr. Race, I have been here a good many days and I would like to have these papers brought up so my attorney can take charge of it' and he says, ' They will be here.' "

Sprague, the plaintiff's attorney, testified: " About the 9th of October the plaintiff called at my office and gave me this receipt with an order on it for the notes, but Mr. Race did not come around. I waited some time and notified him by letter that I had the matter in charge, and requested him to call and see me; but I didn't see him, so I notified Mr. Chandler and he came to my office on the 26th of February, 1883, in company with Mr. Race. He introduced Mr. Race to me and told me he had brought him there for the purpose of having me see him. He said to Mr. Race, in my presence, ' Now, Mr. Race I demand of you those notes referred to in that receipt. I want you to deliver those notes to me or to Mr. Sprague, my attorney here. I want him to take action in the matter as I have been delayed long enough.' Mr. Race stated then and there, in substance, that he would surely bring up the notes and deliver them to me the next morning. I asked him who was the trustee named in the trust deed, and he says, ' It is either I or my brother, I am not certain which.' ' What is your brother's name?' I asked, and he said ' A. S. Race.' Mr. Race did not call on me on the 27th nor the 28th, and I waited until the 3d of March, and not hearing from him I brought this suit. On the 5th of March he came into my office and brought with him what purported to be the notes in question, and offered them to me but I declined to receive them. I told him that I had commenced suit and could not accept them, at least until I had heard from my client. He went away, however, leaving the notes upon my table, and I took them after he went away and put them into my drawer. Later in the day he called with his attorney to talk with me in regard to the notes, and I said, ' Here are your notes; you can have them,' and after some conversation he took them away. I told him in that conversation that I should have to insist upon our rights, as he had not brought them around as he agreed to and I had brought this suit."

The defendant testified as follows: "I remember going to Mr. Sprague's office with Mr. Chandler on the 26th of February, 1883. Just before I went there Mr. Chandler called on me in reference to those notes, saying that he had made up his mind to have his attorney foreclose, and asked for the notes. I said I hadn't them there; I thought they were out at my house at Irving Park. I said I would get them and bring them in. He asked me if I could get them that afternoon, and I said yes, we would go out on the 3:30 train, and he could return in about an hour afterward, and I could give them to him. He made an appointment to meet me at three o'clock, which he did, and we started, as I supposed, for Irving Park to get the notes; and as we started he says, 'Let us walk up La Salle street here and call on my attorney, Mr. Sprague, as I want to get some facts with reference to the lots and the foreclosure, and would like to have you meet him.' I called up there with him and he introduced me to Mr. Sprague, and while there he says, 'It will not be necessary for me to go out with you; you may go out and get them and bring them in.' I says, 'Certainly, I will bring them in,' and I told him that I would have them here the next day if I could. That was the conversation in substance. No demand was made more than they asked me to bring them in the next day from Irving Park. The word demand was not used. He never asked me for them before. He talked once or twice of having the lots foreclosed. I expected to return the next morning, and I thought I would bring them. When I arrived home that night I found my father dangerously ill, and the doctor there at the bedside. He had a congestive chill. We were up with him all that night, and attending to him all the next day and the next three or four days—myself and family and father's brother—and for days we didn't think he would live from hour to hour, but he recovered, and I think in about three or four days I came in. During that time of excitement I did not think to look for the notes; and then on the morning I came in, just before I got ready to start, I supposed I could put my hand on the notes, but I didn't find them. I remembered, in the mean-

Race v. Chandler.

time, that I was out to Aurora where I had a store for two years, and left them there with my brother, and I thought probably they might be there among his papers. I went and found them there and brought them that morning on the first train I could, and tendered them, or gave them to Mr. Sprague, and he says, ' I don't want them;' and I says, 'Why, Mr. Chandler wanted me to leave them here you know;' and he says, ' I have commenced suit on them;' and I says, ' That is a funny proceeding;' and I asked him what he meant by it, and he referred me to my own attorney. I left the notes on his desk, but he refused to take them. At that time I had not the slightest idea that he had commenced suit against me."

The foregoing is all the evidence in the record tending to prove a conversion of the notes in question by the defendant.

Mr. DAVID S. PRIDE, for plaintiff in error; as to conversion, cited 2 Greenleaf on Ev., 9th Ed., §§ 636, 642, 644; Manny v. Burley, 10 Johnson, 175; Bristol v. Burt, 7 John. 254; Addison on Torts, 4th Eng. Ed. 398.

Mr. LEVI SPRAGUE, for defendant in error; as to evidence of a conversion, cited Durell v. Mosher, 8 Johnson, 347; Jones v. Sinclair, 2 N. H. 319; 3 Starkie on Ev., 1501; 1 Chitty on Pleading, 181, 184.

As to demand: Cooley on Torts, 453; 1 Chitty on Pleading, 176; 6 Wait's Actions and Defenses, 174.

BAILEY, J. We have carefully considered the evidence in this case, and are of the opinion that it fails to establish the conversion by the defendant of the promissory notes in question. " A conversion," says Mr. Greenleaf, " in the sense of the law of trover, consists either in the appropriation of the thing to the party's own use and beneficial enjoyment, or in its destruction, or in exercising dominion over it in exclusion or defiance of the plaintiff's right, or in withholding the possession from the plaintiff under a claim of title inconsistent with

his own." 2 Greenl. on Ev., § 642. And as said by the Supreme Court, "a conversion is a positive tortious act. Mere *non-feasance*, or neglect of some legal duty, will not suffice to support trover, although it may constitute a sufficient ground to maintain an action on the case." Sturges v. Keith, 57 Ill. 451.

We find no evidence tending to show an actual conversion. The defendant's possession of the notes was originally rightful. They were put into his hands by the plaintiff to be by him collected or negotiated for the plaintiff's benefit, and nothing had occurred to change the character of his possession up to the time of the demand claimed to have been made in the office of the plaintiff's attorney a few days before the commencement of the suit. It is not pretended that he ever appropriated them to his own use or destroyed them, and whether he performed his legal duty as bailee in endeavoring to collect or negotiate the note is immaterial, as no failure in that respect would lay any foundation for a recovery in this form of action.

It is said, however, that his leaving the notes with his brother at Aurora was of itself a conversion. Cases are doubtless to be found which hold that a bailee of goods who delivers them to another, without authority, is guilty of a conversion. But it is to be observed that the circumstances under which the notes were left at Aurora are not shown, but only the mere fact that they were left there. Before such fact, then, can be held to constitute a conversion, it must appear that, by the contract of bailment, the defendant had no authority to place the notes in his brother's custody under any circumstances or for any purpose. We are disinclined to adopt so restricted a construction of his authority. He was employed to collect or negotiate the notes without any restriction as to the mode in which that should be done, and he must, therefore, be deemed to have had authority, by implication, to make use of such instrumentalities and to adopt such mode as, in the ordinary course of business, were usually employed for such purpose.

But it further appears that the notes were secured by deeds

Race v. Chandler.

of trust, and the evidence tends to show that the defendant's brother was the trustee. Not only did the defendant's authority to collect carry with it by implication the power to foreclose the security, but the defendant was afterward expressly directed by the plaintiff to procure such foreclosure. In order to foreclose the deeds of trust, it was not only proper but necessary for the defendant to place both the deeds of trust and notes in the hands of the trustee.

The question remains whether a conversion is shown by evidence of a demand and a refusal. A demand and refusal do not of themselves constitute a conversion, but are only evidence of a prior conversion. And it is well settled that they are only *presumptive* evidence, capable of being rebutted by proof of any facts which constitute a legal justification or excuse for non-delivery. Thompson v. Rose, 16 Conn. 71; Dietus v. Fuss, 8 Md. 148; Edwards v. Hooper, 11 Mees. & Wels. 363; Huxley v. Hartzell, 44 Mo. 370; Lockwood v. Bull, 1 Cow. 322; 2 Greenl. on Ev., § 644. In Lockwood v. Bull, *supra*, it is said: "A demand and non-compliance are *prima facie* evidence of a conversion, and will induce a jury to find it, unless the defendant adduces evidence to negative the presumption. But it is competent for the defendant to give in evidence everything which tends to prove that there was no conversion."

The evidence shows that the plaintiff demanded the notes in question of the defendant, but there is no evidence of a refusal by the defendant, or of any act or omission on his part which, in our opinion, is tantamount to a refusal. The notes were not present and so were not susceptible of immediate delivery. The defendant, instead of refusing to comply with the demand, assented to it, and proposed to bring the notes in from his residence at Irving Park the following day, and his proposal was assented to by the plaintiff. If it had appeared that this proposal of the defendant was made in bad faith and with no intention to perform, such conduct might perhaps have been held to be tantamount to a refusal; but the evidence is directly the other way.

- There can be no doubt from the evidence that the defend-

ant fully intended at the time of his interview with the plaintiff to bring in the notes the following day and deliver them to the plaintiff's attorney, but on reaching his home he found that his father had been suddenly taken ill, and that his illness was of such a character as to require the defendant's presence at his bedside night and day for a number of days. That anxiety on account of his father's illness should for the time being drive from his mind all thought of the notes was not unnatural, nor does it furnish evidence of bad faith, or of an intention to commit a tort. It can hardly be said that, under the circumstances, it was his duty to leave his father's bedside, where his attendance was imperatively required, and make a journey to Chicago to deliver the notes, in order to escape the imputation of having tortiously converted them to his own use. As soon as his father's health admitted of his absence, he looked for the notes at his house, but failing to find them there he concluded that he must have left them at Aurora, where he himself had a store for two years, and where his brother was then living. He immediately went to Aurora and found the notes and returned by the first train to Chicago and offered to deliver them to the plaintiff's attorney. That was the seventh day after the demand, and two days after the commencement of the suit.

Mr. Greenleaf, in the section of his treatise on the law of evidence last above cited, says: "The refusal must be absolute, amounting to a denial of the plaintiff's title to the possession, and not a mere excuse or apology for not delivering the goods at present; but it need not be expressed; it may be inferred from non-compliance with a proper demand." Here any inference of a refusal, to be derived from the defendant's delay in his compliance with the demand, is, we think, fully rebutted by the circumstances of the case.

But it is said that the defendant agreed to deliver the notes on the day following the demand, and that his failure to do so amounted to a refusal. It should be observed that this is not a suit to enforce a contract, or to recover damages for its breach. The action of trover can not rest upon a mere breach of contract. As said by Lord Ellenborough in Severin v.

Keppel, 4 Esp. 156, "That which begins in contract, a non-performance of what the party so undertakes to do, or a bare non-delivery of what he undertakes to deliver, is not to be considered as of itself amounting to a tortious conversion." Doubtless the defendant's agreement to deliver the following day should be considered as a circumstance among all the others shown by the evidence, as bearing upon the effect to be given to his delay in complying with the demand. But we are satisfied, when that as well as all the other circumstances are considered, that there was no such unreasonable delay as amounted in law to a refusal, and therefore, that no conversion of the notes is shown.

The finding of the court being unsupported by the evidence, the judgment will be reversed and the cause remanded.

Judgment reversed.