## THE FIRST NATIONAL BANK OF MONMOUTH

v.

## MARTHA STRANG, ADMINISTRATRIX.

*National Banks—Reorganization—Special Deposits—Loss—Trover—Liability of New Bank—Measure of Damages—Evidence—Demand.*

1.  A national bank may receive special deposits and give receipts therefor.

2.  In an action to recover from a national bank the value of certain government bonds which had been specially deposited with a national bank which, having gone into liquidation, was succeeded by the defendant bank which had the same name, place of business, books, business, and substantially the same officers, the interest on said bonds having been regularly paid after the reorganization by the defendant until its own suspension, when the bonds were found to be missing, it is *held:* That, from the time of the organization of the new bank, the acts and declarations of the cashier within the scope of his authority were the acts and declarations of said bank; that his knowledge in regard to the bonds in question was the knowledge of both banks; that the payment of the installments of interest by the new bank was an admission that the bonds were in its possession; that the court below was warranted in finding that said bonds came into possession of the defendant bank upon its organization; and that the demand made, if any was necessary, was sufficient.

3.  The measure of damages in an action of trover is the current market value of the property at the time of its conversion with interest until the time of trial; no distinction or exception to this rule is recognized when the property converted happens to be bonds, and when the demand and refusal either constitute the conversion or afford presumptive evidence of it.

[Opinion filed December 8, 1888.]

IN ERROR to the County Court of Warren County; the Hon. T. M. SHAW, Judge, presiding.

Messrs. KIRKPATRICK & ALEXANDER and GRIER & STEWART, for plaintiff in error.

Neither the declarations of Hubbard, nor the receipt given by him in 1879, nor any of his acts during the existence of the old bank, or while he was an officer of the old bank, and before he was an officer of the defendant bank, could in any way be evidence against the new bank to bind it, or even to show the

existence of the bonds. The whole weight of the receipt, or of the declarations of Hubbard, are as admissions, and can not tend in any way to bind the defendant bank, because at the time they were made he was not an officer of the defendant, nor was it even in existence.

There being no legal connection between these two corporate beings, the iniquities of the former can not be visited upon the latter; and although there might be evidence enough in the record to show the former a bailee of the bonds sufficient to make it responsible for them, that could not affect the latter. If these people had such a claim against the former, they had the right and should have sought to make it out of its estate, and not out of the defendant, simply because it was a namesake, or because it bought a part of the assets of the former.

In order to show liability on the defendant as a bailee of the bonds, they must show the bonds, at some time, in the possession or custody of the defendant. In order to show a liability in trover, they must show the bonds came into the possession of the defendant, and a conversion of them, or what would be equivalent to a conversion. This they wholly fail to do by any evidence legal to bind the defendant. The possession of the bonds by the old bank, if it ever had such possession, would not be possession by the new bank, for the reason that they were entirely distinct corporations.

The new and the old corporations are not the same. See Bellows v. Hallowell, etc., Bank, 2 Mason, 44; Blair v. The St. L., H. & K. Ry. Co., 22 Fed. Rep. 36; Wyman v. Hallowell, etc., Bank, 14 Mass. 57; Bruffet et al. v. Great Western Ry. Co., 25 Ill. 310; Cook v. The Detroit, Grand Haven & Milwaukee Ry. Co., 43 Mich. 349; L. E. & W. Ry. Co. v. Griffin, 92 Ind. 487; Neff v. Wolf River Boom Co., 50 Wis. 585; Menosha v. Milwaukee Railroad Company, 52 Wis. 414.

These two associations being entirely separate and distinct, the defendant association is not liable for the debts or default of the other, except as included in the special contract between them.

In order to recover in trover, it was necessary that plaintiff should show the possession of the bonds in question in the

defendant; showing possession in the old bank was not sufficient. It will be kept in mind that no one knows that the bonds sued for were ever in existence; no one knows that Hubbard ever made the exchange; no one ever saw the bonds, nor even coupons from the bonds. All the evidence there is to prove that the exchange of bonds was made, is Hubbard's declarations while cashier of the old bank. All the evidence that the bonds sued for were ever in the old bank, is the receipt given by Hubbard, while acting as its cashier, and the presumption which might arise from the payment of what purported to be interest on such bonds, quarterly.

It is a proposition so axiomatic as not to require the citation of authorities that, in order to bind a person by the acts or declarations of an agent, the person doing the acts, or making the declarations, must be either in fact the agent, or held out as an agent by the person sought to be held. But in this case the defendant association sought to be held by this receipt and these declarations, was not even in existence at the time the receipt was given, or the declaration made. There being no direct proof that the bonds were in fact exchanged, and that the bonds sued for were actually in the possession of the old bank, the only way in which the existence of the bonds or their custody by the old bank is proven, is by the admissions of Hubbard, and by the admission of that fact contained in the receipt of the old bank. These being simply admissions of the old bank, or its agents, and that is all any of them are, they are not evidence against the defendant.

It will be observed that, at no time after the organization of the defendant association, was any receipt given for the bonds, nor were they ever seen by any one, nor are there any declarations by Hubbard, or any one else connected with the defendant, showing that any such bonds were in its custody, or even in existence. The only evidence in this record which could possibly be construed to that effect, is the fact that Hubbard from time to time paid to the agent of the plaintiff, what she took or understood to be, quarterly interest on her bonds. Had the bonds been traced to the possession of the defendant, or it connected with them in such a manner as to

impose on it an obligation to become accountable for them, or look after them, then there might be some weight given to such payments, as an admission tending to bind it; but the bonds never having been traced to its possession or custody, and there being no evidence of any obligation ever having been assumed by the defendant in reference to them, that fact is not evidence to bind it. The most that can be said for the evidence is, that in a suit against Hubbard, it might be taken as an admission by him, but not so as against the bank. The bonds never having been shown to have been in the custody of the defendant, and there being no proof of any obligation ever having been undertaken by this bank in reference to them, Hubbard could make no declarations in that manner, which would bind the defendant. It was under no obligation to pay or collect the interest on the bonds, and when Mr. Hubbard undertook to do anything of that kind, or pay interest on the bonds, he was wholly outside of his duties and outside of the scope of his authority. Henry v. Northern Bank, 63 Ala. 527; Bank of United States v. Dunn, 6 Pet. 51; Bank of the Metropolis v. Jones, 8 Pet. 12; Salem Bank v. Gloucester Bank, 17 Mass. 1; Wyman v. Hallowell and Augusta Bank, 14 Mass. 58; Grimshaw v. Paul, 76 Ill. 164; First National Bank of Lyons v. Ocean National Bank, 60 N. Y. 278; West St. Louis Savings Bank v. Parmalee et al., 95 U. S. 557; Morse on Banks and Banking, pp. 188, 543.

In trover the plaintiff must prove a conversion of the property by the defendant. 1 Chitty's Plead., title Trover, 156; 2 Greenl. Ev., Sec. 642.

A demand and refusal does not of necessity prove a conversion unless it is shown the party has it in his power to deliver up the goods, and with good cause refuses to do so. 1 Chitty's Plead., title Trover, 160; 2 Greenl. Ev., Sec. 644; Race v. Chandler, 15 Ill. App. 532; Keime v. Dale, 14 Ill. App. 308; Sturges et al. v. Keith, 57 Ill. 451; Wiley v. The First National Bank of Brattleboro, 47 Vt. 546.

If these bonds ever came to the custody of the defendant it can not be said they were lost through its negligence. It took the same care of deposits left for safe keeping which it

did of its own valuable property, and such as it was proper to take with such property. Its servants, until the time of the failure, were supposed to be honest by every one, and its cashier bore a good reputation for honesty and ability, and the bank would not be liable for his thefts. Morse on Banks and Banking, p. 97; Foster v. The Essex Bank, 17 Mass. 479; Scott v. National Bank of Chester Valley, 72 Pa. St. 461.

Messrs. MATTHEWS & PEACOCK and JAMES A. McKENZIE, for defendant in error.

The receipt itself is *prima facie* evidence that the bonds were deposited, and there is not in the record a syllable of evidence to contradict it. The admission of Miss Martha Strang that she never saw the bonds, is in no sense evidence to contradict the receipt.

The question of power of a national bank to receive special deposits and give receipts for them, is settled. Revised Stat. U. S., Sec. 5228; Chattahooche Nat. Bank v. Schley, 58 Georgia, 369; First Nat. Bank v. Graham, 100 U. S. 699; First Nat. Bk. of Monmouth v. Dunbar, 118 Ill. 625, which last case has much in common with this case.

The acts and declarations of its cashier were the acts and declarations of the bank No. 85, and the acts and declarations of its cashier were the acts and declarations of bank No. 2751, the party to the record here.

Not only the admissions and declarations of parties to the records are admissible, but also the acts and declarations of those who are in privity with them. Greenleaf on Ev., Vol. 1, Secs. 189, 190.

We are entitled to it upon the ground of privity. Smith's Leading Cases, Vol. 2, p. 390; 2 Wharton on Evidence, Sec. 1163; Vennum v. Thompson, 38 Ill. 144; Mueller v. Reblhan, 94 Ill. 149; Hanchett v. Kimbark, 118 Ill. 129.

We urge that the court below had reason to be satisfied that the preponderance of evidence was with the plaintiff below; that the bonds came to the defendant bank as a special deposit from bank No. 85.

The demand and refusal are not claimed by us to be conclusive evidence of a conversion, but they are *prima facie*

evidence.  1 Chitty, p. 157; 2 Greenleaf, Sec. 644; Johnson v. Howe, 2 Gilm. 342; Bruner v. Dyball, 42 Ill. 34.

Demand and refusal are both proved and admitted. · Then. they must account for the bonds.  They have utterly failed to do so.  No reasonable mind, from this evidence, can decide what finally became of the bonds.  If we take the view that Hubbard sold them for the benefit of the bank, no demand and refusal are necessary.  See Bank v. Dunbar, 118 Ill. 625.

UPTON, J.  This was a suit begun by Janet Strang in her lifetime to recover the value of thirty-one (31) $100 four per cent. United States Government bonds, claimed to have been deposited for safe keeping with the plaintiff in error by the intestate of the defendant in error.

Some time in December, 1873, the defendant's intestate deposited for safe keeping in the First National Bank of Monmouth, Illinois, $3,100, in 6–40s and 7–20s United States Government bonds, taking its receipt therefor.

The interest, as the same from time to time became due upon these bonds, was paid at said bank.  In 1879, this class of bonds, 6–40s and 7–20s, having been " called " in by the Government under the act of Congress authorizing the issue thereof, the defendant administratrix, as agent for her mother, Janet Strang, applied at the bank and made inquiry as to the method and means of making an exchange of these "called" bonds for other government bonds of a like amount.  B. T. O. Hubbard, the cashier of the bank, informed her that the bank was doing business in Washington and could make the exchange for her without further trouble to her, and thereupon direction was given for the bank to make the exchange.

Shortly thereafter, in July, 1879, the defendant in error, calling at the bank to hear if the exchange had been made, was informed by the cashier, Hubbard, that the exchange had been made, and he then wrote and delivered to her the following receipt, viz.:

"$3,100.                    MONMOUTH, ILL., July 24, 1879.

" Received of Mrs. Janet Strang for safe keeping in our bank safe, thirty-one hundred dollars United States four per

cent. bonds, interest payable July 1st, October 1st, January 1st and April 1st.

"B. F. O. HUBBARD,
"Cashier."

Upon the delivery of this receipt she paid to said Hubbard for the bank, for difference in making the exchange, or fees for purchase, the sum of $8, and she delivered to said cashier the receipt of the bank for the deposit of the other bonds made in 1873. The bonds for which the last receipt was given were not shown to the defendant in error at any time after the exchange, but the interest thereon was paid at the bank quarterly when called for at its counter during its business hours, and from the general funds or money of the bank, as it had been before, from the time of the taking of said receipt, in 1879, until the bank closed its doors, in 1884, being $31 every three months, the last of which payments was made on April 1, 1884, one week before the bank closed and ceased doing business as hereafter stated.

B. T. O. Hubbard was the cashier of the bank from some time in 1868 until the bank ceased to do business, in 1884. It was the custom of the bank to receive special deposits for safe keeping, and a part of its vault had pigeon holes or boxes for that purpose.

The First National Bank of Monmouth, Illinois, was chartered September 17, 1863, and the treasury number of its charter was 85, and it went into liquidation in the spring or early summer of 1882, its charter expiring in the summer or fall of that year.

The stockholders of this association, or a part of them, desiring to continue the banking business under the national banking law, organized an association having the same name as the old one, viz., "The First National Bank of Monmouth, Ill.," which new association was duly chartered under the act of July 7, 1882, with the United States Treasury number, 2757. This new association began business on or near the date of its charter in the banking room formerly occupied by the old banking association. The officers and directors of the old association, with one exception, became the officers and directors of the new association.

By a written agreement of July 7, 1882, between the First National Bank of Monmouth (in liquidation) and the new association, the new association took the assets of the old (except its surplus of $50,000, which was divided among its stockholders), and assumed to pay all its liabilities " to the extent and as shown by its books." B. T. O. Hubbard was appointed cashier of the new bank and continued to act in that capacity until April 8, 1884, when it was put in liquidation and a receiver was appointed for it by the comptroller of the Treasury of the United States under the National Banking Act.

W. C. Oakley, a national bank examiner, took possession of the said last named bank on the 8th day of April, 1884, and then made an examination of its affairs and scheduled its assets; he found $400 in United States bonds in the bank safe, $50 in 4 per cent. bonds, and $350 in 4½ per cent. bonds.

On the 29th day of April, 1884, Guy Stapp was commissioned receiver of the bank, and took possession thereof on the 2d of May, 1884. No package or special deposit was found in the bank or its vault or safe, marked or indicated as belonging to Mrs. Janet Strang, or any government bonds other than those before indicated in the safe with the assets of the bank.

Other special deposits were found in the vault of the bank belonging to various persons, the ownership of which was marked or indicated thereon, and which were, from time to time, delivered by the officers of the bank as called for, receipts being taken therefor by such bank officers.

The special deposits were not scheduled or taken possession of, or in any manner interfered with by the receiver. No entry or memorandum of any special deposits was shown upon the books or papers of the bank.

The books of the bank showed that at the close of its business, April 8, 1884, it should have had $131,000 cash in bank; there was turned over to the receiver between $7,000 and $8,000 only.

The books of the bank did not show any United States bonds. Demand was made of Joseph Martin, president of the bank, in writing (to which was attached a copy of the receipt),

for the bonds in question, on the 18th day of April, 1884. The bonds were not delivered on such demand. This suit was commenced April 22, 1884. On the 26th January, 1886, Janet Strang departed this life and her death was suggested on the record. Martha Strang was appointed administratrix of her estate, and, on motion, was substituted as plaintiff in this suit.

The first and second counts in the declaration were in case for the loss of the bonds through negligence, and the third was in trover for the wrongful conversion of the bonds. Plea, the general issue.

The case was tried by the court without a jury, by consent, and the issues were found for the defendant on the first and second counts, but found for the plaintiff on the third count, and judgment was entered against the defendant for the sum of $4,527.93 damages, and for costs; to reverse which judgment the case is brought to this court, and it is assigned for error, 1st, that the court below admitted improper evidence offered by the plaintiff; 2d, that the court erred in refusing proper evidence offered on the part of defendant; 3d, the court erred in finding for the plaintiff; 4th, the court erred in the amount of its findings; 5th, the court erred in refusing motion for new trial.

*First.* It is claimed the receipt read in evidence, of date of July 24, 1879, issued by the First National Bank of Monmouth, "Number 85," was improper evidence against this defendant, the First National Bank of Monmouth, "Number 2751."

The same objection is made to the evidence of Martha Strang as to the deposit in the old bank, "No. 85," of the $3,100 par value of 6–40 and 7–20 government bonds, and the exchange thereof for the like amount of four per cent. government bonds of the par value of $3,100 by Hubbard, cashier of the old bank, and of the payment of the installments of interest thereon.

It is true that the basis of the claim of plaintiff's intestate is the receipt and deposit of the bonds in question with the First National Bank of Monmouth number 2751, and its subsequent conversion of them to its own use. It must be borne in mind that while in fact the old bank went into

liquidation and ceased business on a particular day, the new one was formed under the same name, at the same time, doing business at the same banking house, having the same president, the same cashier, the same employes, the same vault and safe, and was the same to all outward appearances, with the same special deposits that the old bank, number 85, had the day before. This record fails to show that plaintiff's intestate, or indeed, the business public, was aware of any change in the legal status of bank "number 85." So far as outward indications went, it was the same after bank "number 2751" was announced as before. One evening the curtains went down on bank "number 85" and the next morning went up on bank "number 2751." It became a different bank in law and in fact by the private action of its stockholders taking a new number at the Treasury Department of the Government, and after dividing $50,000 of its surplus assets among the stockholders of the bank "number 85," it transferred its assets remaining, banking house and fixtures, and contracted for the discharge of its liabilities "as shown by its books;" its special deposits passed to the new bank, and the old bank ceased to exist. But any one doing business with the new bank or its officers as a special or ordinary depositor with the bank, who was not informed of the change, would not have discovered it.

We think the question of the power of a national bank to receive special deposits and give receipts for such, is settled. Revised Statutes U. S., Sec. 5228; Chattahooche Nat. Bank v. Schley, 58 Ga. 369; First National Bank v. Graham, 100 U. S. 699; First National Bank of Monmouth v. Dunbar, 118 Ill. 625.

Wm. P. Schall testified: "My connection with this bank began in March, 1881; I was individual book-keeper. It was the custom of the bank to receive special deposits for safe keeping. Papers of different kinds were kept there; they were usually in envelopes. There were several tin boxes that set on the floor in the vault; some of the directors had special deposits there. I suppose the directors knew outsiders had special deposits there; quite a number of special deposits

were there all the time I was there.    I was in the employ of the bank at the time of its re-organization.  David Rankin was president of the bank on July 6, 1882.    B. T. O. Hubbard was cashier.   Willis S. Hubbard and myself were book-keepers. There was no notice given depositors to call and get deposits, general or special, that I know of, when the bank changed. The old bank shut down the windows at night and the new one opened them in the morning.    The new bank had the same books, the same accounts, the same employes, and the same things in the vault.    I am acquainted with Martha Strang; have seen her in the bank frequently.    Papers left for safe keeping were kept in the vault; it was a room eight by ten feet, supposed to be burglar and fire proof.    It had three doors; a wicket door with spring lock, and double doors with combination lock.    The cashier and teller had the combination and no one else, I think, to the vault door.    The depositors did not get into the vault; deposits were handed to some officer of the bank, and when called for, were handed out by some of its officers."

Robert J. Gun testified:    "Am one of the attorneys for defendants in this case; was employed in the bank about noon on the day of its failure; quite a large number of special deposits were there; when bank closed I had to do with delivery of special deposits; by direction of Oakley, the matter was left largely to me.    There were two packages of special deposits in the safe in the vault.    Safe was inside vault; had to send to Chicago for expert to come and open it.    In safe were some United States Government bonds, 4 per cent. and $4\frac{1}{2}$ per cent. bonds.    Did not count those bonds myself."

Martha Strang testifies:    "The receipt for these bonds was given to me by B. T. O. Hubbard; he was cashier of the First National Bank at Monmouth.    I received payments of interest on the bonds mentioned in this receipt to my mother as it became due; on the day the interest came due from the bank, Hubbard, the cashier of the bank, paid it to me from October 1, 1879; the last payment April 1, 1884, just one week before the bank closed.    It was paid four times a year right along from 1879 to 1884.    The money paid me was taken from the safe generally, but sometimes from money lying on the table."

By the seventh division of Section 5136, Revised Statutes of the United States, the First National Bank of Monmouth, Illinois, was authorized, by its officers and agents or board of directors, to exercise all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, bills of exchange and other evidences of debt; by receiving deposits; and by the fifth division of the same section, it was authorized to elect or appoint a board of directors, president, vice-president and cashier, and to require bonds of them.

The plaintiff's intestate, in the month of December, 1873, did make a special deposit in the First National Bank of Monmouth, Illinois, of United States Government bonds of the par value of $3,100; these bonds were designated as Government six-fortys and seven-twentys, and a receipt by the bank was executed therefor and delivered to her. These bonds, being called in by the United States Treasurer under the act of Congress authorizing the issue thereof, at the request of plaintiff's intestate were, by the bank, through its cashier, sold or, exchanged for the like amount in par value of what was called United States Government four per cent. bonds, and the difference in the sale and re-purchase or exchange, or the fees for such exchange or purchase, was paid to said bank, being $8, by plaintiff's intestate.

These bonds last named were left in said bank as a special deposit soon after the purchase or exchange thereof, and a receipt therefor given, dated July 24, 1879, as is rendered by its cashier, in the receipt given therefor. By the terms of this receipt these bonds were to be kept in the safe of the said bank, to which its cashier and agent alone had access.

In 1882, when the old bank went out of existence, sold out its effects to the new bank, number 2751, it left the special deposits intrusted to it with the new bank; at least there is some evidence to that effect, as we have shown in the record, and no evidence to rebut it. From the time of the organization of the new bank, number 2751, in July, 1882, when Hubbard was appointed its cashier, the acts of the cashier, within the scope of his authority, were the acts of the bank.

It will not be denied that it was within the scope of his authority to purchase, or deal in bonds and coupons as well as other commercial securities. It is undisputed that, from the date of the re-organization down to within some days of the close of the defendant bank, the old receipt was allowed to stand as originally issued, therein admitting the possession of these bonds for safe keeping, without notice that the new bank had undertaken to pay debts and liabilities of the old bank only "to the extent and as showed by its books," and had by its cashier actually paid on the bonds called for by this receipt the coupons or quarterly installments of interest until within one week of the failure of the bank, being seven quarterly installments of interest.

There is no evidence tending to show that, at the time the old bank went out of existence, in 1882, these bonds were not in its safe, and if they were there when the new bank commenced business, and the cashier of the old bank as well as of the new bank knew it, his knowledge was the knowledge of the old as well as of the new bank. Bank v. Dunbar, 118 Ill. 625.

The acts of the cashier of the new bank, after its re-organization, in the payment of the installments of interest with the funds of the bank, was an admission that these bonds were in its possession, and the purchase or payment of the coupons are circumstances to prove, if not actual proof, that the bonds were in the safe or vault of the new bank, and subject to its control, after its re-organization.

In this view, evidence connecting the old bank, number 85, with the new bank, number 2751, was proper. The acts and declarations of its cashier, within the scope of his authority, were the acts and declarations of bank number 85, by the giving of the receipt in question for these bonds, and the like acts and declarations of its cashier recognizing the bonds in possession of the new bank by the payment of interest thereon, were the acts and declarations of bank number 2751, the party to the record here.

We think the court below did not err in admitting or excluding evidence offered on the part of the plaintiff upon the matter complained of.

Vol. XXVIII·22

*Second.* As to the second assigned error, it is sufficient for us to say that no evidence is pointed out as offered by the defendant which was refused admission or consideration by the court below.

*Third.* We think, from all the evidence in this record and the surrounding circumstances in evidence, the court below was warranted in finding that the new bank, the plaintiff in error, had in its possession at the time of its organization the bonds in controversy in this suit, which facts and circumstances we have sufficiently commented upon in the examination of the other errors assigned and considered. At least, we think, the plaintiff made, by the evidence, a *prima facie* case, and the court did not err in so finding.

*Fourth.* It is claimed that the court below erred in finding for the plaintiff the amount of the judgment below. This error assigned, questions the rule of damages adopted by the court below. It is insisted that the measure of damage was the value of these bonds when taken, and not when a demand was made.

We understand the proper measure of damages in an action of trover is the current market value of the property at the time of its conversion, with interest from that time until the trial; and in this State no distinction or exception is recognized when the property converted happens to be stocks; and where the demand and refusal either constitute the conversion or afford presumptive evidence of it, it is no infringement of this rule to regard that—the demand and refusal—as the time for estimating the value. Sturges v. Keith, 57 Ill. 451.

The rule as claimed by plaintiff in error is wholly impracticable in this case, since it can not be determined when these bonds were actually taken. The court found, and we think it was authorized to find under the evidence, *prima facie*, that the bonds in question came into possession of the plaintiff in error upon its re-organization, with the other special deposits of the old bank, and that it has paid the seven coupons or installments of interest as the same became due thereon up to the time of its failure, or within six days of that time; and its failure to show any legal excuse for the absence of the

First Nat. Bank of Monmouth v. Strang.

bonds, either by direct or circumstantial evidence in the case, upon demand made on the officers of the bank therefor, and its refusal or neglect to deliver the same, afford presumptive evidence of the conversion of these bonds; and, for the purpose of estimating the damages in this case, the court below was authorized to assess the damages at the current market value of the bonds at the time of such demand and refusal, which, as shown by the evidence, was $1.23 on the dollar on the 18th day of April, 1884; and the damages assessed in the court below were much below that rate which, under the evidence and the rule as stated, the court would have been authorized to find.

It is insisted also that the demand in the case at bar is wholly inoperative and of no avail, because made after the bank examiner had taken possession of the assets of the bank and it was beyond the power of the bank to comply with such demand. The evidence is that the special deposits were not taken possession of by the bank examiner or receiver, but were left in charge of the officers of the bank, who delivered the same as called for to the owners thereof. Besides, if these bonds should be regarded as a special deposit, notwithstanding the appropriation by the bank, and it had failed, and its property was in the hands of the United States authorities, the officers of the bank still had the right, under the National Banking Act, to deliver special deposits. Revised Statutes of United States, Sec. 5228; Bank v. Dunbar, 19 Ill. App. 558. If there was a conversion in fact before failure, then no demand would be necessary. After a careful examination of this record we find no error that ought, in our opinion, to reverse the judgment of the court below in this case, and we think it should be affirmed, and it is so ordered.

*Judgment affirmed.*